A01A1955. DEKALB COLLISION CENTER, INC. et al. v. FOSTER et al.
(562 SE2d 740)

RUFFIN, Judge.

Henry Foster was killed at his workplace, DeKalb Collision Center, Inc. ("DeKalb Collision"), during a fight involving several DeKalb Collision employees and some contractors. Foster's daughters sued DeKalb Collision and the employees involved in the fight (collectively "DeKalb Collision Defendants"), as well as the contractors, alleging that their negligent and wilful actions caused his death.[1] The plaintiffs settled their claims against the contractors prior to trial, and following trial, a jury returned a verdict against the DeKalb Collision Defendants. The DeKalb Collision Defendants appeal, asserting that the trial court erred in denying their motions for directed verdict and judgment notwithstanding the verdict because the plaintiffs' tort claims were barred by the exclusive remedy provision of Georgia's Workers' Compensation Act.[2] Because the evidence shows that Foster's death arose out of and in the course of his employment, we agree that the trial court erred in denying the motions.

1. In making this inquiry on appeal,

> we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments [notwithstanding the verdict] are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions

---

[1] Foster's daughters, Erica Foster and Melissa Brown, both sued in their individual capacity, and Erica also sued as the administrator of his estate.

[2] See OCGA § 34-9-11 (a).

therefrom, demands a certain verdict. Thus, a judgment n.o.v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. If the evidence is conflicting, or if insufficient evidence exists to make a one-way verdict proper, judgment n.o.v. should not be granted.[3]

Viewed in favor of the verdict, the evidence shows that DeKalb Collision is an automobile paint and body repair shop. The building where the shop is located consists of six service bays with garage doors that open to a parking area and an office situated between the bays. About two or three weeks before the incident, the owner of DeKalb Collision, Mark Watkins, orally contracted with a brick mason, James Lamar Powell, for construction of a brick facade and some planters on the front of the building. When the work was completed, a dispute erupted over the contract price. Powell insisted that he had agreed to do the work for $3,000, and his brother, David, gave Watkins an invoice for that amount. Watkins, however, insisted that Powell had agreed to do the job for $1,500, and when Watkins reported that to David, David responded that he would let Powell collect the money.

The next morning, while Watkins was pressure washing the newly laid brick, Powell, accompanied by his father and another individual,[4] came to the business and asked Watkins why he was refusing to pay the $3,000. Watkins responded that it was too much money, and a more heated argument ensued. Powell told Watkins that if Watkins would not pay him, he was going to tear the brick down. Powell then went to his truck and retrieved a sledgehammer and a pickax.

It appears that Powell returned to the area with the sledgehammer and that his father accompanied him with the pickax. It is, however, almost impossible to precisely report what occurred next, except to say that a fight broke out. Apparently, several DeKalb Collision employees came out of the repair shop and surrounded Powell. Powell testified that Watkins and another individual punched him, and numerous other individuals "just piled on [him] . . . like [they] were playing rugby." Watkins, who thought he was the intended victim of the sledgehammer, testified that he wrestled it away from Powell and stowed it inside the shop. Meanwhile, other employees engaged Powell's father, who was knocking bricks off the top of the

---

[3] *American Global Dev. Group v. Sasser & Weatherford, Inc.*, 249 Ga. App. 479 (548 SE2d 465) (2001).
[4] The other individual, Michael Pate, was named as a defendant in the complaint, but on appeal, nobody claims that he participated in the events that morning.

planter with the pickax. At some point during this altercation, a DeKalb Collision employee attempted to subdue Powell's father with the pressure washer.

Foster was employed by DeKalb Collision as a paint preparation man and was one of the employees that left his work area and became involved in the scuffle. At the time, Foster was working next to an open bay door located near the brick planter. According to Frank Hawk, who was working with Foster, Foster was sanding a car when he stated: "[they are] going after Mark [Watkins] with the sledgehammer." It appears that Foster left the bay, went toward the brick planter, and started to break up the fight involving Powell's father. Powell's father testified that, during the altercation, Foster was struck in the eye with the pressure washer wand. A bicycle rider who witnessed the fight from the street testified that he thought Foster was struck with a "wooden handle instrument." That is all we know about Foster's actions that morning, but when the melee ended, he lay unconscious near the brick planter. Foster died from his injuries at the hospital later that evening. The chief forensic investigator for the DeKalb Medical Examiner attributed the cause of death to Foster being struck with the butt end of the pickax handle.

The exclusive remedy provision of the Workers' Compensation Act provides in part that

> [t]he rights and the remedies granted to an employee by this chapter shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents, or next of kin, at common law or otherwise, on account of such injury, loss of service, or death; provided, however, that no employee shall be deprived of any right to bring an action against any third-party tort-feasor, other than an employee of the same employer.[5]

For an injury or death to be covered under the Act, however, it must "aris[e] out of and in the course of the employment."[6] As a general matter, "[a]n injury or death arises out of employment when it is apparent to the rational mind, upon consideration of all the circumstances, that there is a causal connection between the conditions under which the work is required to be performed and the resulting injury."[7] The DeKalb Collision Defendants argue that Foster's death was causally connected to his employment, under what is called the

---

[5] OCGA § 34-9-11 (a).
[6] OCGA § 34-9-1 (4).
[7] (Punctuation omitted.) *Williams v. Atlanta Family Restaurants*, 204 Ga. App. 343, 344 (419 SE2d 328) (1992).

positional risk doctrine, because his job subjected him to the risk by placing him in the position where he received the fatal injury.

The positional risk doctrine was adopted by the Court of Appeals of Georgia in 1979.[8] Before that time, many cases required the risk to "be peculiar to the work and not common to the neighborhood."[9] In *Nat. Fire Ins. Co. v. Edwards*, we changed that rule and adopted the positional risk doctrine to determine whether injuries from job-neutral perils arose out of the employment.[10] The positional risk doctrine provides that, for an "injury to be compensable[,] it is only necessary for the claimant to prove that his work brought him within range of the danger by requiring his presence in the locale when the peril struck, even though any other person present would have also been injured irrespective of his employment."[11]

Notwithstanding our unanimous whole Court decision in *Edwards*, the positional risk doctrine has been inconsistently applied, and many subsequent decisions have held that the risk must be peculiar to the work.[12] While the inconsistent use of these two tests is disturbing, and must certainly confuse the bench and bar, this is not an appropriate case to resolve that conflict because Foster's death would be covered by the Act under either test.

The risk arose out of Foster's job because it was peculiarly related to his employment and his job brought him within the range of danger when the peril struck. Though it is undisputed that Foster's job description required him to sand cars, apply primer, and wash the vehicles in preparation for paint jobs, these were not the strict and absolute limits of his occupation with DeKalb Collision. Indeed, our case law often allows coverage under the Act for injuries sustained when an employee is not actually performing a task that is part of his job description. For instance, although walking back and forth to one's car parked in an employer's parking lot is not part of

---

[8] See *Nat. Fire Ins. Co. v. Edwards*, 152 Ga. App. 566 (1) (263 SE2d 455) (1979).

[9] (Punctuation omitted.) Id. at 567 (1).

[10] See id. at 567-568; see also *Booth v. Essex Ins. Co.*, 231 Ga. App. 542, 544-545 (498 SE2d 528) (1998) (applying positional risk doctrine to determine if killing arose out of employment).

[11] *Edwards*, supra at 567 (1); see also *Booth*, supra.

[12] See, e.g., *Prudential Bank v. Moore*, 219 Ga. App. 847, 848 (1) (467 SE2d 7) (1996) ("causative danger must be peculiar to the work") (punctuation omitted); *A & P Transp. v. Warren*, 213 Ga. App. 60, 62-63 (443 SE2d 857) (1994) (physical precedent only) (same); *Swanson v. Lockheed Aircraft Corp.*, 181 Ga. App. 876, 880 (1) (c) (354 SE2d 204) (1987) (same); see also, e.g., *SCI Liquidating Corp. v. Hartford Fire Ins. Co.*, 272 Ga. 293, 294 (526 SE2d 555) (2000) (interpreting insurance policy exclusion pertaining to injuries that arise out of employment to mean that injury must "arise as a proximate result of the peculiar nature of the employment"); but see *Hulbert v. Domino's Pizza*, 239 Ga. App. 370, 373 (2) (521 SE2d 43) (1999) (injuries "need not arise from something peculiar to the employment"); *Boulware v. Quiktrip Corp.*, 226 Ga. App. 399 (486 SE2d 662) (1997) (same); *Macy's South, Inc. v. Clark*, 215 Ga. App. 661, 663 (1) (452 SE2d 530) (1994) (same).

most job descriptions, the ingress and egress rule generally covers injuries suffered while an employee is engaged in such action.[13] More on point, although being assaulted is not an obvious part of most jobs, the Act compensates for injuries in cases where an employee is assaulted or killed if there is a nonpersonal, causal connection to the work.[14]

In this case, there is no evidence that Foster's death was causally connected to any personal matters. Though there are widely varying accounts about the fight itself, it is clear that it was rooted, at least initially, in a simple contract dispute involving Foster's workplace. The escalation of that dispute, caused by Powell's resort to self-help, did not make it any more personal to Foster. Instead, from Foster's perspective, the conduct of Powell and his father related to either destroying part of the very building in which Foster was working or attacking Foster's employer with a sledgehammer.[15] Foster's reaction to either event was peculiarly related to his job as a DeKalb Collision employee and resulted in his being in the place where he was struck.

Under Georgia law, "an employee owes a duty of loyalty, faithful service and regard for an employer's interest."[16] In the workers' compensation context, we have similarly recognized that "[a] servant's occupation is in law the occupation of the master, and he would be entitled to do whatever the master might do in the *protection* of his

---

[13] See *Rockwell v. Lockheed Martin Corp.*, 248 Ga. App. 73 (545 SE2d 121) (2001).

[14] See, e.g., *Heard v. Mitchell's Formal Wear*, 249 Ga. App. 492, 493-494 (1) (549 SE2d 149) (2001) (employee of formal wear shop assaulted during work-related argument); *Handcrafted Furniture v. Black*, 182 Ga. App. 115, 116 (1) (354 SE2d 696) (1987) (co-owner of furniture business murdered because of business-related dispute); *Swanson*, supra (angry student hit instructor in the face after classroom confrontation); see also *Fidelity &c. Co. of N.Y. v. Barden*, 79 Ga. App. 260, 262 (54 SE2d 443) (1949) (observing that, it is only "[a]fter the event, [that] it is apparent to the rational mind that there is a causal connection between the conditions under which the employment was performed and the resulting injury"). In his treatise on workers' compensation law, Professor Arthur Larson observes that although there are cases that preclude coverage because the employee's presence at the place of fighting was not, strictly speaking, demanded by his employer,

> [t]he cases taking this position, which are mostly quite old, are subject to the criticism that the compensation-law conception of "arising out of the employment" should not be at the mercy of hairsplitting distinctions about the precise limits of an employee's duties. If the employment in fact causes the employees to get into arguments, even about matters which on paper are none of their business, it is still possible to say, in a broader sense, that the argument arose out of the employment.

1 Larson, Larson's Workers' Compensation Law, § 8.01[4] (2001).

[15] In their brief, appellees claim there is evidence showing that, at the time he was injured, Foster was actually defending Powell's father from being savagely beaten. But appellees provide no citation to such evidence of Foster's motivation, and we are thus limited by Hawk's testimony showing that Foster was prompted to action by Powell going after Watkins with a sledgehammer.

[16] (Punctuation omitted.) *Crews v. Roger Wahl, C.P.A., P.C.*, 238 Ga. App. 892, 901 (4) (d) (520 SE2d 727) (1999).

master's property."[17] Thus, we held that where an employee is injured doing what he reasonably thinks is necessary to protect his employer's property, if the employee has not used excessive force the injury arises out of his employment and is, therefore, covered by the Act.[18]

We see no reason why the result should be different if Foster's intent was to safeguard his employer. Considering Foster's general duty of faithful service to his employer's interests[19] and that his occupation was that of his employer,[20] his scope of employment permitted him to protect his employer, Watkins, from being pummeled by a sledgehammer and to attempt to quell the violence that disrupted Watkins' business. Certainly the law does not contemplate that an employee should be forced to stand idle, watching such an affray in his employer's business, for fear that, if injured, he will not be compensated. Thus, we conclude that the risks confronting Foster that day were peculiar to his employment and caused him to be where he received the fatal injury.

Given the facts of this case, we also easily conclude that Foster's death arose in the course of his employment.

> In the course of employment refers to time, place and circumstances under which the accident took place. An accident arises in the course of the employment within the meaning of the compensation Act when it occurs within the period of employment at a place where the employee reasonably may be in the performance of his duties while he is fulfilling his duties or engaged in doing something incidental thereto. The courts of this state, in effectuating the humane purposes for which the Workers' Compensation Act was enacted, have taken a broad view in evaluating those activities which are incidental to employment. . . .[21]

The above discussion clearly shows that Foster was on the clock, at a place that he could reasonably be expected to be, performing duties incidental to his job at DeKalb Collision. Accordingly, we find that Foster's death arose out of and in the course of his employment and that his survivors' exclusive remedy is under the Workers' Compensation Act.[22] The trial court erred in ruling otherwise, and its judgment is reversed.

---

[17] (Emphasis in original.) *Scott v. Travelers Ins. Co.*, 49 Ga. App. 157, 169 (174 SE 629) (1934) (physical precedent only).

[18] See id. at 161, 170.

[19] See *Crews*, supra.

[20] See *Scott*, supra.

[21] (Citations, punctuation and emphasis omitted.) *Williams*, supra at 344-345.

[22] See OCGA §§ 34-9-1 (4); 34-9-11 (a).

Although we realize that the results here seem particularly harsh, considering that a loyal employee lost his life serving the interests of his employer,

> [t]he Workers' Compensation Act is to be liberally construed in determining whether an injury is compensable under it. It must be viewed in this manner both when an employee has made a claim and is seeking coverage under it and when an employer has sought its protection as a defense to a tort action. One of the purposes of the Act is surely the humanitarian one of providing relief to injured employees, but another purpose is to protect employers against excessive recoveries of damages. We are to interpret the Act, if its language will permit, so as not to deny its benefits to either employee or employer. If the damages in this case or in death cases generally are inadequate, it is the legislature which must effectuate a change, not the court by way of excluding such cases from workers' compensation coverage.[23]

2. Our decision in Division 1 renders it unnecessary to address the remaining enumerations of error.

*Judgment reversed. Johnson, P. J., and Ellington, J., concur.*

DECIDED MARCH 11, 2002 —
RECONSIDERATION DENIED MARCH 27, 2002 — ▮▮▮▮▮▮

*Savell & Williams, William E. Turnipseed*, for appellants.
*Joe A. Weeks*, for appellees.

---

[23] (Citations omitted.) *Hadsock v. J. H. Harvey Co.*, 212 Ga. App. 782, 784 (442 SE2d 892) (1994).